## COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH
### NO. 02-12-00202-CV


| | |
|---|---|
| CAROL ANN GIBBONS AND VIRGINIA FLOYD | APPELLANTS |
| V. | |
| LUBY'S INC., LUBY'S RESTAURANTS LIMITED PARTNERSHIP, AND LUBY'S MANAGEMENT, INC. | APPELLEES |

-----------

### FROM THE 348TH DISTRICT COURT OF TARRANT COUNTY
### TRIAL COURT NO. 348-241100-09

----------

## MEMORANDUM OPINION[1]

----------

### 1. Introduction

Anaphylaxis reactions[2] resulting from food allergies cause an estimated 30,000 emergency room visits and 150 deaths in the United States every year.[3]

---

[1]*See* Tex. R. App. P. 47.4.

This case arose out of an anaphylaxis reaction suffered by Appellant Carol Ann Gibbons after dining with her cousin Appellant Virginia Floyd at a Luby's cafeteria-style restaurant (the restaurant) owned and operated by Appellee Luby's Restaurants, L.P. (Restaurants). Restaurants is a subsidiary of Appellee Luby's Management, Inc. (Management) and Appellee Luby's Inc., and Management is the general partner of Restaurants.

Gibbons and Floyd sued Restaurants, Management, and Luby's Inc. (collectively the Luby's entities). After a jury trial, the trial court signed a judgment awarding damages of $12,623.30 to Gibbons in accordance with the jury's verdict.

In 106 issues, Gibbons and Floyd complain of the trial court's final judgment and of its earlier orders setting aside a default judgment in their favor and granting a new trial, granting a directed verdict on some of Gibbons's claims, denying a directed verdict for Gibbons on the question of proportionate responsibility, denying their motion for judgment notwithstanding the verdict and other post-trial motions, and granting summary judgment for the Luby's entities

---

[2] *See* National Institutes of Health, U.S. National Library of Medicine, *Anaphylaxis*, Medline Plus Medical Encyclopedia (explaining that anaphylaxis is a severe, life-threatening, whole-body type of allergic reaction to a substance), *available at* http://www.nlm.nih.gov/medlineplus/ency/article/000844.htm (last updated May 11, 2014).

[3]FDA, *Food Allergies: What You Need to Know* (June 2010), *available at* http://www.fda.gov/downloads/Food/ResourcesForYou/Consumers/UCM220117.pdf.

on Floyd's bystander claim.  Because we hold that summary judgment was proper, that Gibbons cannot appeal from the granting of the new trial, and that sufficient evidence supports the judgment, we affirm.

## 2.  Background

Gibbons and Floyd dined at the restaurant on October 26, 2007.  Gibbons, who was visiting from Pennsylvania, is allergic to whitefish.[4]  Gibbons ordered a salmon croquette, which she believed did not contain whitefish.  Shortly after starting to eat, Gibbons's throat began feeling scratchy, and her face began to turn red.  At Floyd's request, Restaurants employee Nicole Huffman checked with the kitchen staff to find out the croquette's ingredients.  Huffman reported to Floyd that the ingredients included whitefish.

Certain that Gibbons was experiencing an allergic reaction, Gibbons and Floyd left the restaurant and headed toward the closest hospital.  Fearing the hospital was too far away, Floyd stopped at a fire station, and paramedics there were able to treat Gibbons until an ambulance could arrive.  By that time, Gibbons was unconscious.  Gibbons was taken by ambulance to the hospital where she was admitted and diagnosed with anaphylactic shock, hypoxemia,

---

[4]*See* Jennifer Lee Johnson, *Of Darwin's Dreams and Nightmares:  The Concealed Violence of a Global Whitefish Commodity* 2 n.ii (Apr. 2008) (thesis, University of Michigan) (stating that the term "whitefish" "is used by the seafood fish industry to refer to easily substitutable fish species, such as cod, catfish, tilapia[,] and Nile perch" and that the term is "an economic category" rather than a biological one), *available at* http://deepblue.lib.umich.edu/handle/2027.42/58200?show=full.

and acute respiratory failure. She was sedated, intubated, and put on life support. After being treated, Gibbons recovered and was discharged two days after her admission.

Three days after the incident—that is, the day after Gibbons's discharge—she and Floyd went to the restaurant and discussed the incident with a manager there. The day after that, Gibbons discussed the incident over the telephone with Patricia Boudreaux, a risk manager working for the Luby's entities who called Gibbons to discuss what happened.

Gibbons and Floyd subsequently sued the Luby's entities. Gibbons asserted claims for negligence, gross negligence, violations of the Deceptive Trade Practices Act (DTPA),[5] breach of contract, and products liability. Floyd asserted a bystander claim for mental anguish.

Restaurants filed an answer that contained a special exception stating that it had been sued in the wrong name because it "was sued as LUBY'S, INC., LUBY'S RESTAURANTS LIMITED PARTNERSHIP, AND LUBY'S MANAGEMENT, INC.," when its "correct name is simply LUBY'S RESTAURANTS LIMITED PARTNERSHIP." Luby's Inc. and Management did not file answers.

---

[5]Tex. Bus. & Com. Code Ann. §§ 17.41–.63 (West 2011 & Supp. 2014) (*amended by* Act of May 27, 2015, 84th Leg., R.S., ch. 1023, § 1, 2015 Tex. Sess. Law Serv. 3576 (West), *and by* Act of May 26, 2015, 84th Leg., R.S., ch. 1080, § 1, 2015 Tex. Sess. Law Serv. 3721 (West)).

4

Gibbons and Floyd filed a motion for default judgment against Luby's Inc. and Management. After a hearing, a visiting judge signed a default judgment awarding Gibbons $2,870,998.61 in damages and $3,641,997.22 additional damages under the DTPA for knowing and intentional conduct, awarding Floyd $600,000 plus $1,200,000 additional damages under the DTPA, and awarding attorney's fees of $1,465,198.33 for Gibbons and $720,000 for Floyd.

Luby's Inc. and Management filed a motion to set aside the default judgment, and, after a hearing, the trial court granted the motion. The Luby's entities then filed a motion for summary judgment on Floyd's bystander claim and for no-evidence summary judgment on Gibbons's claims. The trial court granted the motion as to Floyd's bystander claim but denied the motion as to Gibbons's claims.

The case proceeded to a jury trial, and, after the close of evidence, the trial court granted a directed verdict on Gibbons's gross negligence, breach of contract, DTPA, and strict liability claims. The court submitted Gibbons's negligence claim against Management and Restaurants to the jury. The charge asked the jury to find whether "Luby's" or Gibbons were negligent and to apportion what percentage of responsibility each bore, with "Luby's" defined to include Restaurants, Management, and the employees at the restaurant.

The jury returned a 10–2 verdict finding Gibbons and Luby's each 50% negligent and assessing Gibbons's damages at $10,000 for past pain and mental anguish, $1,050 for loss of earning capacity in the past, $10,000 for past physical

5

impairment, $3,996.61 in medical expenses, $100 for replacing the clothes Gibbons was wearing at the time of the occurrence, and $100 for the cost of changing her ticket for her return flight to Pennsylvania.

Management and Restaurants filed a motion for entry of final judgment. They subsequently filed a motion to quash notices of deposition of jurors Bobby Mayo, Brenda Webster, Tris Renee Fitzgibbon, and Elaine Whitman, which had been sent by Gibbons and Floyd's attorney. They also filed a motion to strike, for sanctions, and for protection, asserting that despite the filing of the motion to quash, Gibbons and Floyd's attorney had deposed "various jurors." Mayo and Whitman also filed objections to the depositions.

Gibbons responded by filing a motion to compel the testimony of Mayo, Fitzgibbon, and Whitman. Gibbons attached the affidavits of jurors John Bell and James Parks and asserted that Mayo, Fitzgibbon, and Whitman had all made comments to other jurors that they did not believe in awarding damages for pain and suffering or mental anguish. After a hearing, the trial court signed an order of protection ordering that Gibbons, Floyd, and their attorney were prohibited from issuing any further deposition notices or subpoenas to Mayo and Whitman without prior court order.

Gibbons filed a motion for mistrial and, in the alternative, for judgment notwithstanding the verdict (JNOV). In the motion, Gibbons asserted among other grounds that the Luby's entities had in discovery misrepresented and concealed the identity of the food server who had served Gibbons.

6

In light of the jury's findings on proportionate responsibility,[6] the trial court signed a final judgment ordering that Gibbons recover $12,262.30 from Restaurants and Management. Gibbons and Floyd then filed a motion for new trial, which the trial court denied. Gibbons and Floyd now appeal.

### 3. Discussion

The appellants' brief in this case raises 106 issues, and "many of [the] issues are repetitive and subsumed by, or overlap, other issues."[7] The brief contains 30,000 words over 180 pages.[8] Although the argument section includes underlined text that appears in many (but not all) instances to serve as headings, the headings do not clearly correlate with the issues, and not every change of argument is prefaced with underlined text. We have structured this opinion to address what we understand to be the complained-of actions by the trial court and Gibbons and Floyd's "contentions as they appear in the argument section of

---

[6] *See* Tex. Civ. Prac. & Rem. Code Ann. § 33.012(a) (West 2015) ("[T]he court shall reduce the amount of damages to be recovered by the claimant with respect to a cause of action by a percentage equal to the claimant's percentage of responsibility"), 33.013(a) (West 2015) ("[A] liable defendant is liable to a claimant only for the percentage of the damages found by the trier of fact equal to that defendant's percentage of responsibility").

[7] *See Cruz v. Van Sickle*, 452 S.W.3d 503, 511 (Tex. App.—Dallas 2014, pet. filed) (citing Tex. R. App. P. 38.1).

[8] This court allowed Gibbons and Floyd to file a brief that exceeded the word count imposed by the rules of appellate procedure.

[their] brief, considering them only to the extent they are preserved for appellate review and adequately briefed."[9]

### 3.1. Order Granting a New Trial and Setting Aside the Interlocutory Default Judgment

Gibbons and Floyd's first thirty-eight issues relate to the trial court's granting of Luby's Inc. and Management's motion for new trial and setting aside the default judgment, as well as the trial court's denial of their motion asking that the default judgment be reinstated.

Aside from two limited exceptions not applicable here, "an order granting a new trial rendered while the trial court has plenary power over the case is not subject to appellate review, either by direct appeal from the order or from a final judgment rendered after later proceedings."[10] Accordingly, the trial court's grant of a new trial and setting aside of the default judgment is not reviewable in this appeal.[11] For the same reason, neither may we review the trial court's denial of

---

[9] *See Cruz*, 452 S.W.3d at 513.

[10] *In re N.G.K.*, No. 05-08-00789-CV, 2009 WL 2973665, at *1 (Tex. App.— Dallas Sept. 18, 2009, no pet.) (mem. op.) (citing *Wilkins v. Methodist Health Care Sys.*, 160 S.W.3d 559, 563 (Tex. 2005) and *Cummins v. Paisan Constr. Co.*, 682 S.W.2d 235, 236 (Tex. 1984) and recognizing that the only two exceptions to the rule are when the trial court's order was void or when the trial court erroneously concluded the jury's answers to special issues were irreconcilably conflicting).

[11] *See Cummins*, 682 S.W.2d at 235–36 (holding—in a case in which the trial court granted a new trial after a default judgment and, after a jury trial, rendered judgment for the defendant—that the trial court's order setting aside the default judgment was not reviewable on appeal). *Cf. In re Columbia Med. Ctr. Of Las Colinas*, 290 S.W.3d 204, 209–10 (Tex. 2009) (orig. proceeding) (holding

Gibbons and Floyd's motion to set aside the grant of the new trial, which asked the trial court to reconsider its grant of the new trial. Accordingly, we overrule Gibbons and Floyd's first thirty-eight issues.

### 3.2. Floyd's Bystander Claim

The next four issues challenge the trial court's summary judgment for the Luby's entities on Floyd's bystander claim. In the summary judgment motion, the Luby's entities asserted that a bystander claim requires the claimant to be "closely related" and that Floyd and Gibbons were not closely related. Relying on a standard first articulated by a California court and applied by the San Antonio Court of Appeals, they argued that because Gibbons and Floyd are cousins and Gibbons has lived in Pennsylvania her entire life while Floyd has lived in Arlington, Texas since 1984, Gibbons and Floyd were, as a matter of law, not closely related.

To their motion, the Luby's entities attached excerpts of Gibbons's deposition in which she testified that she was sixty-three and has lived in Pennsylvania her whole life and has never lived anywhere else, that her family and Floyd's lived together for a few years starting when she was one and Floyd was three, that they talk often on the phone, and that she used to visit Floyd once a year but now tries "to get here at least every other year." They also attached

that mandamus review of the grant of a new trial after a jury trial was appropriate because, under the circumstances, Columbia did not have an adequate appellate remedy).

9

excerpts from Floyd's deposition in which she stated that she moved away from the city in which Gibbons lived in 1972 but that she tries to visit Gibbons in Pennsylvania at least once a year. She stated that she and Floyd are "very close."

As stated by the Luby's entities, Texas law permits a bystander to recover for mental anguish that arises when the person witnesses a traumatic injury to a close relative that was caused by the defendant's negligent action.[12] The bystander may recover only if the trial court determines that the injury was reasonably foreseeable.[13] The determination of foreseeability is based on the following three factors set out by the California Supreme Court in *Dillon v. Legg* and adopted by the Supreme Court of Texas:

> (1) The bystander was located near the scene of the accident as contrasted with one who was a distance away from it.
>
> (2) The shock resulted from a direct emotional impact upon the bystander from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence.
>
> (3) The bystander and the victim were **closely related**, as contrasted with an absence of any relationship or the presence of only a distant relationship.[14] [Emphasis added.]

---

[12]*Edinburg Hosp. Auth. v. Trevino*, 941 S.W.2d 76, 80 (Tex. 1997).

[13]*See Freeman v. City of Pasadena*, 744 S.W.2d 923, 923–24 (Tex. 1988).

[14]*See id.* (adopting elements of a bystander claim as set out in *Dillon v. Legg*, 441 P.2d 912, 920 (Cal. 1968)).

Thus, the question of whether a claimant is "closely related" to the injured party was included as a factor in determining foreseeability. "These factors are to be interpreted flexibly."[15] The factors should be applied on a case-by-case basis, but "when the material facts are undisputed, . . . whether the plaintiff is entitled to recover as a bystander is a question of law."[16] It is the last factor in dispute here.

In the same year that the Supreme Court of Texas adopted the *Dillon* standard, the California Supreme Court refined its *Dillon* decision in *Elden v. Sheldon*.[17] The *Elden* court concluded that "[t]he need to draw a bright line in this area of the law is essential" because "[t]he temptation to give legal effect to close emotional ties between unrelated or distantly related persons is often strong" and "[t]he problems of multiplication of actions and damages that result from such an extension of liability would place an intolerable burden on society."[18] A bright line satisfies the need both "to limit the number of persons to whom a negligent defendant owes a duty of care" and to keep courts from bearing the difficult burden of evaluating the sufficiency of the emotional

---

[15]*Edinburg Hosp. Auth.*, 941 S.W.2d at 80 (quoting *Freeman*, 744 S.W.2d at 924).

[16]*United Servs. Auto. Ass'n v. Keith*, 970 S.W.2d 540, 542 (Tex. 1998).

[17]*Elden v. Sheldon*, 758 P.2d 582, 586 (Cal. 1988).

[18]*Id.* at 588 (internal quotation marks and citation omitted).

11

attachment between two relatives.[19]   California has drawn such a bright line; "[a]bsent special circumstances," the term "closely related" includes only "parents, siblings, children, and grandparents of the victim" or "relatives residing in the same household."[20]

Our sister court has adopted this standard.   In *Garcia*, the San Antonio Court of Appeals discussed California law and observed,

> To require mere emotional "closeness" would require constant ad hoc line-drawing; courts would have to probe case-by-case the genuineness of the relationship.  Presumably when several people were injured, courts would weigh the varying relationships and decide which ones were close enough to justify bystander recovery and which ones were not.  We question whether it is in society's interest for courts and litigants to delve into family relationships to this extent.[21]

The San Antonio court held that the California standard "sets a reasonably bright line that limits suits to a finite number of relatives while ensuring some degree of closeness by requiring that they reside in the same household" or are members of the immediate family.[22]

---

[19]*Id.* at 586–88.

[20]*Thing v. La Chusa*, 771 P.2d 814, 829 n.10 (Cal. 1989).

[21]*Garcia v. San Antonio Hous. Auth.*, 859 S.W.2d 78, 81 (Tex. App.—San Antonio 1993, no writ).

[22]*Id.*; *cf.* Tex. Civ. Prac. & Rem. Code Ann. § 71.004 (West 2008) (limiting wrongful death actions to the surviving spouse, children, and parents of the deceased).  *But see Garcia*, 859 S.W.2d at 82–83 (Butts, J., dissenting) (stating that the purpose of the third prong of *Dillon* is to determine whether the plaintiff's injury is foreseeable, that "it is *the emotional attachments of the family relationship and not legal status* that are relevant to foreseeability," and that

Floyd argues that the test set out by the San Antonio court in *Garcia* was dicta. Because she argues we should not apply the standard used in *Garcia*, we assume she means that part of *Garcia* is obiter dictum.[23] We disagree. The *Garcia* court expressly adopted the California standard and relied on it in reaching its holding.[24] The Corpus Christi Court of Appeals has also applied this standard.[25]

Floyd urges us to reject the standard adopted by the San Antonio court, but she does not suggest an alternative standard for determining when two people are closely related for purposes of bringing a bystander claim. She argues only that the Supreme Court of Texas requires a person bringing a bystander claim to be "closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship," that she and Gibbons lived together in the same home as very young children and have "maintained a

---

because "there must be a strong and close emotional attachment in a familial relationship between the plaintiff and the injured person to establish the basis of recovery for mental anguish," an uncle's residing in the same household as his injured nephew, without more, is not sufficient to support a bystander claim).

[23] *See Lund v. Giauque*, 416 S.W.3d 122, 129 (Tex. App.—Fort Worth 2013, no pet.) (distinguishing between obiter dictum and judicial dictum and defining obiter dictum as "a statement not necessary to the determination of the case and that is neither binding nor precedential").

[24] *Garcia*, 859 S.W.2d at 81.

[25] *See Rodriguez v. Motor Exp., Inc.*, 909 S.W.2d 521, 525 (Tex. App.—Corpus Christi 1995) (holding that Rodriguez could not recover on a bystander claim because the decedent was his cousin-in-law and they lived in separate residences), *rev'd on other grounds*, 925 S.W.2d 638 (Tex. 1996).

close familial relationship," and that "[t]his satisfies the requirement . . . that a Plaintiff bringing a bystander claim must be 'closely related.'"

Arguing that a close emotional relationship shows that she and Gibbons are closely related, Floyd references the excerpt of her deposition testimony she attached to her response to the motion. She does not tell us which testimony on the cited record pages shows a close relationship, but on those pages, Floyd testified that she was godmother to Gibbons's son, that Gibbons was in her wedding, and that they have "maintained a very close relationship all our lives." Floyd stated that they talk on the phone "a few times a month, once a week, couple times a week. Totally depends on the schedules." They have not lived in the same city since the early 1970s. She visits Gibbons in Pennsylvania once or twice a year. Gibbons used to visit her once a year, but for the previous five or six years, it had not been that often.

We agree that generally, only parents, siblings, children, and grandparents of the victim, or relatives residing in the same household, will be considered closely related but that other relatives can, in special circumstances, satisfy that factor of the foreseeability analysis. We do not today outline a general standard by which a familial relationship should be measured to evaluate whether special circumstances allow bystander recovery, but, without discounting the distress that Floyd felt, we hold the trial court did not err by determining based on the summary judgment motion and response that no special circumstances were present as a matter of law. We overrule issues thirty-nine through forty-two.

14

### 3.3. Grant of Directed Verdict for Luby's Inc.

Issues forty-three through forty-seven challenge the trial court's grant of the Luby's entities' motion for directed verdict. We begin our determination of this group of issues with issue forty-three, under which Gibbons challenges the directed verdict for Luby's Inc. that disposed of all of Gibbons's claims against it. Other than citing the standard of review for a directed verdict, Gibbons cites no authority, or inapplicable authority, for and makes no legal argument explaining why Luby's Inc. is liable to her for her product liability, breach of contract, negligence, gross negligence, and DTPA causes of action against it.

Regarding her products liability claim, Gibbons cites no authority and does not explain what elements must be met to establish products liability or how her evidence was sufficient as to those elements to survive a directed verdict. Accordingly, her argument regarding the directed verdict for Luby's Inc. on her product liability claim is waived as inadequately briefed.[26]

Regarding her breach of contract claim, Gibbons argues that "[a]n agreement to purchase food at a restaurant is a valid contract and a food server's representations concerning the ingredients contained in food being sold at a restaurant constitute warranties concerning same." She cites case law for the proposition that a contractual relationship may create duties under both

---

[26] *See* Tex. R. App. P. 38.1(i); *see also Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284–85 (Tex. 1994) (discussing the "long-standing rule" that an appellate point may be waived due to inadequate briefing).

15

contract and tort law.[27]  She does not, however, discuss the elements of a breach of contract claim or explain how her evidence at trial related to those elements and was some evidence that she and Luby's Inc. had a contract.  None of the cases she cites involve a breach of contract claim under facts analogous to this case.[28]  Accordingly, she has not satisfied the briefing requirements for her issue challenging the directed verdict on her contract claim against Luby's Inc.[29]

Gibbons also does not cite any authority to support her argument that her evidence was some evidence that Luby's Inc. was negligent or grossly negligent. She references evidence that she asserts shows Luby's Inc.'s liability—such as an excerpt from a shareholder report of Luby's Inc. stating that "[q]uality control teams" work with restaurant staff "to confirm adherence to our recipes"—but she does not cite any authority that explains under what circumstances a parent company such as Luby's Inc. is liable for the negligence of its subsidiaries.  The

---

[27] *See Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986); *Montgomery Ward & Co. v. Scharrenbeck*, 204 S.W.2d 508, 510 (Tex. 1947) (stating that a contract may give rise to a duty, and negligent breach of that duty may constitute actionable negligence); *Elliott v. Kraft Foods N. Am., Inc.*, 118 S.W.3d 50, 56 (Tex. App.—Houston [14th Dist] 2003, no pet.) (reviewing a judgment against Kraft for a DTPA claim based on breach of implied warranty that goods are fit for their ordinary purpose and observing that under the Uniform Commercial Code, the warranty is generally implied in every contract for the sale of goods and that "[t]he serving for value of food to be consumed elsewhere is a sale of goods").

[28] *See Reed*, 711 S.W.2d at 618; *Scharrenbeck*, 204 S.W.2d at 510; *Elliott*, 118 S.W.3d at 56.

[29] *See* Tex. R. App. P. 38.1(i).

16

one case she cites relating to an entity's right to control another addresses whether a person was an employee or an independent contractor of a company.[30] It had nothing to do with a parent corporation's control of subsidiaries. Her brief is inadequate as to these claims against Luby's Inc.[31]

Her brief is likewise inadequate regarding her challenge to the directed verdict on her DTPA claim against Luby's Inc.; she cites to no authority under which parent corporation Luby's Inc. is responsible under the DTPA for the representations of its subsidiary's employees about the ingredients of the restaurant's products and does not explain how, under such authority, the directed verdict was improper.[32] Instead, in an unrelated part of her brief she asserts that a general partner is liable for a limited partner's debts and obligations. The evidence she cites under this issue relates to whether Luby's Inc. requires subsidiary restaurants to follow its recipes, but it does not relate to the representations made to Gibbons about the ingredients of the salmon croquettes or the legal basis under which a parent is liable for the acts of its subsidiaries for those representations.[33] We overrule Gibbons's forty-third issue.

---

[30] *Newspapers, Inc. v. Love*, 380 S.W.2d 582, 584 (Tex. 1964).

[31] *See* Tex. R. App. P. 38.1(i).

[32] *See id.*

[33] *See Chartis Specialty Ins. Co. v. Tesoro Corp.*, 930 F. Supp. 2d 653, 667 (W.D. Tex. 2013) (noting "the general principle of corporate law that a parent corporation is not liable for the acts of its subsidiaries").

### 3.4. Directed Verdict for the Remaining Luby's Entities on Gibbons's Gross Negligence, Breach of Contract, DTPA, and Product Liability Claims

Gibbons's next group of issues (incorporated with her argument section as to Luby's Inc.) addresses the directed verdict for Restaurants and Management granted by the trial court on all but Gibbons's negligence claims against them. She argues that she presented sufficient evidence at trial to support each element of her gross negligence claims (issue forty-four), her breach of contract claims (issue forty-five), her DTPA claims (issue forty-six), and her products liability claims (issue forty-seven) against Restaurants and Management.

*Directed verdict on products liability and breach of contract claims.*

Gibbons's arguments addressing the directed verdict for Restaurants and Management's on her claims for products liability and breach of contract have the same deficiencies as her arguments on these claims as against Luby's Inc. Accordingly, her briefing is inadequate as to these claims.[34]

In her reply brief, Gibbons cites *American Tobacco Co. v. Grinnell* for the proposition that "[a]n article is unreasonably dangerous if it is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."[35]  Although she does not specify, this argument appears to relate to her products liability claim.

---

[34] *See* Tex. R. App. P. 38.1(i).

[35] 951 S.W.2d 420, 426 (Tex. 1997).

18

This lone authority in a reply brief is not enough to overcome her briefing defects on this issue; it is unclear from the single citation in her reply brief what theory of product liability she believes the evidence supports.[36] From the pages of *Grinnell* that she cites, we can speculate that she alleges products liability based on a marketing defect.[37] But she does not explain how the evidence was sufficient to overcome a directed verdict on a marketing defect products liability claim against Restaurants or Management. We overrule Gibbons's forty-fifth and forty-seventh issues.

*Directed Verdict on DTPA Claims.*

Gibbons argues that the sale of food is a sale of goods under the DTPA and that Restaurants and Management violated the DTPA by failing to disclose that the croquette had whitefish. She asserts that they further violated the DTPA by making affirmative representations (1) that the croquette had characteristics that it did not have, (2) that it contained only certain ingredients when it contained other ingredients, and (3) that it did not have whitefish. Gibbons contends that she produced evidence that these representations were made and that they were

---

[36] *See id.* ("A product may be unreasonably dangerous because of a defect in marketing, design, or manufacturing.").

[37] *See Wilson & Wilson Tax Servs., Inc. v. Mohammed*, 131 S.W.3d 231, 242 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (declining to speculate as to the arguments that could have been brought under a counter-point or attempt to make those arguments for the counter-appellants).

false, misleading, or deceptive under section 17.46(b)(5) of the DTPA,[38] and she argues that she was therefore entitled to recover mental anguish damages under section 17.50(b).

DTPA section 17.49(e) bars a DTPA claim for bodily injury or mental anguish except as provided under subsections 17.50(b) and (h).[39] Gibbons cites to subsection (b) but does not explain how subsection (h)[40] applies to permit her claims. Thus, we consider only if subsection (b) applies.

Subsection 17.50(b) allows a plaintiff to recover mental anguish damages if a DTPA violation was committed knowingly.[41] Gibbons does not, however, tell us what part of the record shows that the server she spoke with at the restaurant about the croquette had actual awareness of the falsity or deceptiveness of his representation that the croquette did not contain whitefish and contained only

---

[38]Tex. Bus. & Com. Code Ann. § 17.46(b)(5) (defining "false, misleading, or deceptive acts or practices" to include "representing that goods . . . have . . . ingredients . . . [that] they do not have").

[39]*See id.* § 17.49(e).

[40]*Id.* § 17.50(h) (West 2011) ("Notwithstanding any other provision of this subchapter, if a claimant is granted the right to bring a cause of action under this subchapter by another law, the claimant . . . may recover any actual damages incurred by the claimant.").

[41]*Id.* § 17.50(b).

salmon.[42]  To the contrary, she points out evidence that, according to her, shows that at the restaurant, servers do not know the ingredients of the croquettes.

She further argues that under subsection 17.50(b), she was entitled to recover her economic damages, including her medical bills, the cost of replacing clothes that had to be cut off of her to render emergency medical treatment, and the cost of changing the date of her plane ticket home.  Assuming that she could recover economic damages for a violation of this section,[43] the economic damages Gibbons listed were submitted to the jury under her negligence claim. She could not recover the same damages twice,[44] and, accordingly, she has not shown how she was harmed by the trial court's grant of directed verdict on her DTPA claims.[45]

---

[42] *Id.* § 17.45(9) (defining "knowingly" as used in the DTPA to mean "actual awareness, at the time of the act or practice complained of, of the falsity, deception, or unfairness of the act or practice giving rise to the consumer's claim").

[43] *See id.* § 17.50(b)(1) (providing that "[i]n a suit filed under this section, each consumer who prevails may obtain . . . the amount of economic damages found by the trier of fact").  *Contra Akin v. Bally Total Fitness Corp.*, No. 10-05-00280-CV, 2007 WL 475406, at *4 (Tex. App.—Waco Feb. 14, 2007, pet. denied) (mem. op.) (upholding summary judgment on a plaintiff's DTPA claim seeking lost wages and mental anguish damages on the ground that the DTPA does not allow claims for damages for claims of bodily injury).

[44] *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 303 (Tex. 2006) ("There can be but one recovery for one injury.") (citation and internal quotation marks omitted).

[45] *See Flying J Inc. v. Meda, Inc.*, 373 S.W.3d 680, 689 (Tex. App.—San Antonio 2012, no pet.) (observing that in some circumstances, an erroneous grant of a directed verdict is harmless); *Cooper v. Lyon Fin. Servs., Inc.*,

Gibbons further argues that she alleged a DTPA claim under section 17.46(b)(24), [46] that representations about the ingredients of the salmon croquette were made to her to induce her to buy the croquette, and that the trial court erred by granting a directed verdict on this claim. That section, however, involves a failure to disclose information that was known at the time of the transaction, and the failure to disclose the information must be done with the intention to induce the consumer into a transaction. Gibbons points us to no evidence in the record that the employee who told her the croquettes contained only salmon failed to disclose information the employee knew at that time or that it was done to induce Gibbons to buy the croquettes. We overrule Gibbons's forty-sixth issue.

*Directed verdict on gross negligence claim.*

Gibbons discusses evidence in the record that she contends shows that Restaurants and Management were grossly negligent. Gibbons does not, however, explain (or cite authority that explains) what must be proven to

65 S.W.3d 197, 209 (Tex. App.—Houston [14th Dist.] 2001, no pet.) (holding that any error in granting a directed verdict on plaintiff's breach of warranty claims was harmless because damages attributable to plaintiff's breach of warranty claims were the same as those for plaintiff's DTPA claim, and the jury found no damages on the DTPA claim).

[46]Tex. Bus. & Com. Code Ann. § 17.46(b)(24) (defining the term "false, misleading, or deceptive acts or practices" to include "failing to disclose information concerning goods or services [that] was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed").

establish gross negligence, and she does not explain how her evidence relates to those elements.[47]  We overrule Gibbons's forty-fourth issue.

### 3.5.  Rulings Related to Comparative Negligence

In issues forty-eight and forty-nine, Gibbons challenges the trial court's denial of her motion for an instructed verdict on the Luby's entities' affirmative defense of comparative negligence.  She argues that no evidence or insufficient evidence supports a finding that she proximately caused the occurrence in question.  In her fiftieth issue, she argues that the trial court erred by submitting comparative negligence questions to the jury because no evidence or insufficient evidence supported its submission.  Because these three issues relate to the sufficiency of the evidence of Gibbons's responsibility for her allergic reaction, we consider them together.[48]

At the close of all evidence, Gibbons asked for an instructed verdict on the issue of her comparative negligence.  The system of comparative negligence replaced contributory negligence, and comparative negligence was then replaced with the comparative responsibility framework in civil practice and remedies code

---

[47]*See* Tex. R. App. P. 38.1(i).

[48]*See Rocor Inter'l, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 77 S.W.3d 253, 262 (Tex. 2002) (stating that a jury's finding must be sustained if it is supported by more than a scintilla of evidence, that is, "if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about a vital fact's existence"); *Kitchen v. Frusher*, 181 S.W.3d 467, 477 (Tex. App.—Fort Worth 2005, no pet.) (stating that a directed verdict is improper if more than a scintilla of evidence exists on the question presented).

chapter 33.[49]   In 1995, "the Legislature modified Chapter 33 by replacing comparative responsibility with proportionate responsibility," and further changes were made to chapter 33 in 2003.[50]

Proportionate responsibility is broader than and encompasses the older concept of contributory negligence.[51]   "A plaintiff's own risky conduct is now absorbed into the allocation of damages";[52] "[t]he same facts that tended to prove . . . contributory negligence may now be used to diminish a plaintiff's recovery by demonstrating that the plaintiff bore some portion of the responsibility for [her] own injuries."[53]

Because proportionate responsibility involves measuring a party's responsibility in causing or contributing to cause the plaintiff's injuries, it

---

[49] *Dugger v. Arredondo*, 408 S.W.3d 825, 830 (Tex. 2013); *see* Tex. Civ. Prac. & Rem. Code Ann. §§ 33.001–.017 (West 2015).

[50] *Dugger*, 408 S.W.3d at 831; *JCW Elects., Inc. v. Garza*, 257 S.W.3d 701, 703 (Tex. 2008).

[51] *See* Tex. Civ. Prac. & Rem. Code Ann. § 33.02(a) (West 2015) (applying chapter 33 to *any* cause of action based on tort and to any action brought under the DTPA); *Austin v. Kroger Tex., L.P.*, No. 14-0216, 2015 WL 3641066, at *10 (Tex. June 12, 2015) (stating that proportionate responsibility encompasses the concept of contributory negligence); *see also Nabors Well Servs., Ltd. v. Romero*, 456 S.W.3d 553, 560–62 (Tex. 2015) (holding that chapter 33 requires a jury to consider relevant evidence of a plaintiff's pre-occurrence injury-causing conduct, including evidence of the plaintiff's negligence or violation of an applicable legal standard).

[52] *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 772 (Tex. 2010).

[53] *Austin*, 2015 WL 3641066, at *10.

necessarily requires a finding that the party was in some way responsible for those injuries.[54] As such, the usual method for submitting proportionate responsibility to the jury has been to include a question in the court's charge asking about liability, followed by a second question asking the jury to apportion the parties' responsibility.[55] Gibbons complains of the submission of both the liability question and the apportionment question.

Whether a plaintiff "bore some portion of the responsibility for his own injuries" is a defensive issue "on which defendants, not plaintiffs, bear the burden of proof."[56] Accordingly, the Luby's entities bore the burden of producing evidence of Gibbons's responsibility. If the evidence at trial included more than a scintilla of evidence that Gibbons contributed to causing her allergic reaction, the trial court was correct to deny the instructed verdict and to submit the question of Gibbons's liability to the jury.[57]

With respect to Gibbons's complaint about the jury's finding, we note that the Supreme Court of Texas has recently clarified that proportionate responsibility is based on each parties' pre-occurrence conduct that causes or

---

[54] *See Moore v. Kitsmiller*, 201 S.W.3d 147, 151 (Tex. App.—Tyler 2006, pet. denied) (writing about comparative responsibility).

[55] *See* Gregory J. Lensing, *Proportionate Responsibility and Contribution Before and After the Tort Reform of 2003*, 35 Tex. Tech L. Rev. 1125, 1132 (2004) (citing the Texas Pattern Jury Charge on proportionate responsibility).

[56] *Austin*, 2015 WL 3641066, at *10.

[57] *See Rocor Inter'l*, 77 S.W.3d at 262; *Kitchen*, 181 S.W.3d at 477.

contributes to causing the plaintiff's *injuries*, rather than causing or contributing to the occurrence that resulted in the injuries.[58] The trial court and the parties in this case did not have the benefit of that recent opinion, and at trial, the jury was asked whether each parties' negligence proximately caused the *occurrence* in question.

In her brief, Gibbons mentions but does not explain the concept of contributory negligence, does not discuss proportionate responsibility, does not cite any authority explaining those legal concepts, and does not explain how the evidence at trial relates to those concepts. She does not cite or mention chapter 33 of the civil practice and remedies code. Nevertheless, we have reviewed the record to see if it contains evidence sufficient to avoid an instructed verdict and to submit the issue to the jury.

The record, as discussed more fully under Gibbon's next group of issues, includes varying evidence about whether Gibbons acted prudently in her treatment of the possibility of cross-contamination of the croquettes from the whitefish and in making sure that the croquettes were safe for her to eat. The testimony on that subject largely came down to the credibility of the witnesses, and the factfinder is the sole judge of the credibility and demeanor of the

---

[58] *See Nabors*, 456 S.W.3d 560–62 (discussing whether proportionate responsibility relates to causing the occurrence or to causing the harm from the occurrence and stating that "the proportionate-responsibility statute specifies the apportionment should ultimately be based on responsibility for the damages suffered").

witnesses and of the weight to be given to their testimony.[59]  We hold that the evidence as discussed below was more than a scintilla of evidence that Gibbons was negligent.  Accordingly, we overrule her forty-eighth, forty-ninth, and fiftieth issues.

Issues fifty-one through fifty-four challenge the sufficiency of the evidence to support the jury's answers to the comparative negligence questions finding Gibbons negligent and apportioning to her fifty percent of responsibility for the occurrence.  Gibbons argues that there was no evidence or insufficient evidence to support the answers, or, alternatively, that the answers were against the great weight and preponderance of the evidence.

Floyd's testimony provided background information about the circumstances giving rise to Gibbons's allergic reaction.  She explained that as she and Gibbons went through the cafeteria line, they asked the servers about the options.

> And I said, "What are the square things?"
>
> And they said, "Fish, fried fish."
>
> And I said, "Oh, [Gibbons] cannot have fish."
>
> And she's like, "No, I can't have fish.  I'm allergic to whitefish."
>
> And there were these round, kind of oblong things beside it, and we said, "What is that?"
>
> And they said, "It's salmon croquettes."

---

[59]*In re S.P.*, 444 S.W.3d 299, 303 (Tex. App.—Fort Worth 2014, no pet.).

And we said, "Just salmon?  **Because she's allergic to the whitefish**."

"Yes, it's salmon."  [Emphasis added.]

Floyd was questioned on and gave testimony about what she and Gibbons said to the servers and what they said to her.  Both sides questioned her extensively on the matter, and her testimony evolved in some respects through the course of her testimony.  She made the following assertions in her testimony:

- When, a few days after the occurrence, Gibbons talked to Luby's investigator Boudreaux, Gibbons was asked if she had asked the server about the ingredients of the croquettes, and Gibbons replied, "**Why should I have to ask**?";

- In the background of that phone call between Gibbons and the Luby's employee, Floyd—who could hear the conversation—said, "**We asked if there was whitefish**";

- Gibbons asked if there was whitefish in the salmon;

- Floyd asked, "**Is this just salmon?  She cannot have the whitefish. She's allergic to it**."  Floyd was mistaken in her earlier testimony, and they did not specifically ask about whether there was whitefish in the croquettes, but they asked if the croquettes were "just salmon" and reiterated that Gibbons was allergic to whitefish;

- They **did not reiterate that Gibbons was allergic** to whitefish; instead, in response to being told that the breaded squares were fish, they said that Gibbons was allergic to whitefish, they asked what the croquettes were, then made comments about Gibbons being able to eat salmon, then asked if the salmon croquettes were "just salmon."  [Emphasis added.]

Thus, Floyd's assertions on the matter, though not wildly contradictory of each other, changed over the course of her testimony from the two having specifically asked if the croquettes had whitefish, to them having asked only if the croquettes were "just salmon" with an added statement that Gibbons had a

28

whitefish allergy, to having said that Gibbons had a whitefish allergy and then shortly thereafter asking if the croquettes were "just salmon."

The evidence was similarly variable regarding the identity of the server with whom the two spoke about the croquettes. Luby's employee Huffman, the checker on that day, stated in a deposition that she could not say for sure whether there were any male servers working that day, but to her knowledge there were none, and at trial she identified two women as the servers. Gibbons stated at trial that the server was a man. Floyd stated unequivocally that the server she and Gibbons spoke to about the croquettes was a middle-aged, thin, white male. In a 2010 pre-trial deposition, however, she was asked who told her the croquettes were just salmon: "Do you remember who said that, whether it was the man or the woman?" She replied, "I don't recall specifically." She was asked, "Do you remember what the man and the woman [servers] looked like?" She responded, "I would only be guessing if I were to answer." The attorney continued, "Do you remember whether either of them were short or tall, hair color, skin color, eye color?" And she replied, "Like I said, I would be guessing."

Gibbons testified as follows:

- She has ordered salmon croquettes at other restaurants without problem, and she has always asked the servers at those restaurants "if there was anything in the croquette other than salmon";

- When asked if, when she orders salmon croquettes at restaurants, she asks what the ingredients are, Gibbons stated, "Not the ingredients";

29

- On the day in question, after turning down the whitefish, Floyd pointed out a beef dish, which Gibbons said she did not want, and then they saw and asked about the croquettes;

- Gibbons attempted to explain away her statement to Boudreaux that she had not asked about the ingredients by explaining that she "didn't ask the ingredients. . . . [She] asked if there was anything but salmon in the croquettes"; and

- Gibbons acknowledged on cross-examination that what she told Boudreaux was, "Why would I ask when [it] said it on the sign?"

There is some evidence that Gibbons asked what was in the salmon but did not remind the servers that she was allergic to whitefish. There is also some evidence from which the jury could have found that Gibbons said she was allergic to whitefish but did not ask what the croquette's ingredients were. The jury could have decided that if Gibbons did ask if the croquettes were "just salmon," from the context, the statement was too ambiguous to have conveyed a question about whitefish. Or the jury could have decided that Gibbons's and Floyd's memories of the day four years earlier were not accurate and their testimony therefore not worth much weight. We hold that, in light of the evidence and given that the question of negligence came down primarily to the credibility of the witnesses and the weight to be assigned to their testimony, there is some evidence from which the jury could have found Gibbons negligent. We further hold that the jury's finding of negligence was not against the great weight and preponderance of the evidence.

As for her complaint about the jury's finding of apportionment, Gibbons argues that there was no evidence upon which the jury could have found her "in

30

any way negligent," or, alternatively, that the evidence supporting the finding was so weak so as to make the verdict clearly wrong and unjust. From her briefing, we construe her complaint to the jury's answer to the apportionment question to be an extension of her challenge to the liability question. In other words, we see her argument as asserting not that the number the jury found should have been some amount less than fifty percent but that it could not have been more than zero percent. We further hold that there is more than a scintilla of evidence that she was somewhat negligent, that the allocation of responsibility was within the jury's discretion, and that the jury's allocation was not against the great weight and preponderance of the evidence.[60] We overrule Gibbons's fifty-first through fifty-fourth issues.

### 3.6. Damages Award

Issues fifty-five through fifty-seven challenge the jury's damages findings and the trial court's denial of Gibbons's motion for JNOV. She argues that the jury's findings of $10,000 for past physical pain and mental anguish, $10,000 for past physical impairment, and $0 for future pain and mental anguish were against the great weight and preponderance of the evidence.

---

[60] *See Hagins v. E-Z Mart Stores, Inc.*, 128 S.W.3d 383, 392 (Tex. App.—Texarkana 2004, no pet.) (stating that "[t]he determination of negligent parties' proportionate responsibility is a matter soundly within the jury's discretion," and "it is not the place of this Court to substitute its judgment for that of the jury, even if a different percentage of allocation could be supported by the evidence").

31

In this section of her brief, Gibbons cites to one case, which sets out the factually sufficiency standard of review.[61]    She does not cite any cases discussing what kind of evidence establishes pain or mental anguish or the jury's discretion in awarding such damages and does not explain how such case law applies to the evidence at trial.[62]

At the end of her argument related to these issues, she argues that the trial court "erred and/or abused [its] discretion" by denying her motion for JNOV. Gibbons does not at this point in her brief cite any law or other authority relating to the standard for granting JNOV.[63]  If she cites any such authority elsewhere in her 180-page brief, we were unable to find it.

"A trial court may disregard a jury verdict and render [JNOV] if no evidence supports the jury finding on an issue necessary to liability or if a directed verdict would have been proper."[64]  If a trial court determines that a jury's answer is against the great weight and preponderance of the evidence, the court cannot disregard a jury's answer and render a JNOV; "[i]n such a situation, the trial court

---

[61] *See Barnett v. Coppell N. Tex. Court, Ltd.*, 123 S.W.3d 804, 813–14 (Tex. App.—Dallas 2003, pet. denied).

[62] *See* Tex. R. App. P. 38.1(i).

[63] *See id.*

[64] *Dallas Area Rapid Transit v. Agent Sys., Inc.*, No. 02-12-00517-CV, 2014 WL 6686331, at *6 (Tex. App.—Fort Worth Nov. 26, 2014, pet. filed) (mem. op.) (citing Tex. R. Civ. P. 301 and *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003)).

may only grant a new trial."[65] Gibbons preserved her factual insufficiency point below and raised it on appeal, and we will consider her issues to be a challenge to both the legal and factual sufficiency of the evidence supporting the damages findings.[66]

"[A]n award of mental anguish damages will survive a legal sufficiency challenge when the plaintiffs have introduced direct evidence of the nature, duration, and severity of their mental anguish, thus establishing a substantial disruption in the plaintiff['s] daily routine."[67] "When claimants fail to present direct evidence" to support these factors, we "determine whether the record reveals any evidence of 'a high degree of mental pain and distress' that is 'more than mere worry, anxiety, vexation, embarrassment, or anger' to support any award of damages."[68] "When the existence of some pain and mental anguish is established, the jury is given considerable discretion in determining the amount of fair and reasonable compensation for the [claimant's] pain and mental suffering."[69]

---

[65]*Id.* at *5.

[66]*See id.*

[67]*Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995).

[68]*Id.*

[69]*Cunningham v. Haroona*, 382 S.W.3d 492, 507 (Tex. App.—Fort Worth 2012, pet. denied).

A summary of the relevant testimony is as follows. Gibbons testified that when she realized the reaction was serious, she was scared. She could not breathe, and she was sure she was going to die. She was worried about who would take care of her husband, who has Alzheimer's. She continued to be afraid that she would die until sometime in the next evening. She blacked out after leaving the restaurant, woke up at the fire station, and then went in and out of consciousness. She did not remember the ride to the hospital, the emergency room, or seeing a doctor. She remembered nothing until she woke up the next day. She continued to drift in and out of consciousness, and she remembered her cousin telling her that she would be okay. She remembered "just bits and pieces." She did not "really wake up" until the day after that. She described the feeling of being hooked up to machines that were breathing for her as frightening, although she "wasn't awake that much."

Gibbons stated that the intubation tube created a burning sensation in her chest that lasted for close to two weeks after the tube was removed. For three or four days after the tube was removed, she could barely swallow, and she threw up blood. She had a sore throat for four or five days. She also developed a urinary tract infection from the catheter that had been put in while she was at the hospital.

For about a week after she got out of the hospital, she felt "very tired, very tired," "[t]ired, weak, . . . like . . . a dishrag that somebody just kept beating." The

34

first week was the worst, and by the middle of the second week, she "was feeling pretty good."

Initially, after the incident, she had "a lot of nightmares." She would wake up feeling like she could not breathe and like the intubation tube was stuck down her throat. By the time of trial, she had the dream about once a month.

When she returned home from her trip to Texas, she saw her primary care physician, who prescribed Cymbalta for the stress she was feeling from her experience. She stayed on the medication for three years. But she then clarified that the medication was not only for the stress arising from the incident: She stated that she "ha[s] a lot of stress in [her] life," and "when [she] came back, [she] was more stressed." She explained, "I can't remember if [the doctor] increased the dose or changed the name of the brand I was using. . . . And then he kept me on that dose after that." The increased stress from the incident went on "about two weeks." She missed two weeks of work due to the occurrence.

In 2006, she had been put on an antidepressant because she was under "multiple stressors," and the sleep medication she was taking did not help her sleep; she agreed that prior to the incident she had been having trouble sleeping. In 2007, she was put on a prescription pain patch for severe osteoarthritis. About a month before the incident, her doctor noted that she was having episodes of heart palpations, she had problematic arthritic pain, and she "does not sleep particularly well." At that time, the doctor put her on Cymbalta "for depression and chronic pain" and referred her to a pain clinic. He also noted that she had a

problem with chronic obstructive pulmonary disease; Gibbons stated that no doctor had ever told her that she had that condition, but she admitted that she had a history of smoking and was still a smoker at the time of trial. On redirect, Gibbons stated that prior to the incident, she did not have similar nightmares to the ones she has now.

We have no doubt that Gibbons's experience was frightening and that, in the immediate aftermath, she suffered pain. But we cannot say that the jury's award of damages to compensate her for her pain and mental anguish had no evidence to support it or that it was against the great weight and preponderance of the evidence.[70]

Gibbons argues that the weakness of the evidence supporting the jury verdict is illustrated by affidavits signed after the verdict by two of the jurors stating that they did not believe that the verdict was just and that they regretted agreeing to it. The statements in the affidavits on which Gibbons relies discuss the deliberations of the jury, and we may not consider them, even assuming that statements made during jury deliberations are relevant to the question of whether evidence supports the verdict.[71] We overrule Gibbons's fifty-fifth through fifty-seventh issues.

---

[70]*See Cunningham*, 382 S.W.3d at 507.

[71]*See Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362, 370, 371 (Tex. 2000).

36

3.7. Denial of Motion for Judgment Notwithstanding the Verdict
Motion for Mistrial, and Motion for New Trial

In issues fifty-eight through seventy, Gibbons complains of the trial court's denial of her motion for JNOV, motion for mistrial, and motion for new trial. In issue fifty-nine, Gibbons argues that the trial court erred and abused its discretion by denying her motion for JNOV on the issue of comparative negligence. We are unable to discern any argument on this issue in her brief, but we point out that we have already held that some evidence supported the jury's findings on the matter.[72] We overrule this issue.

Under the remainder of this group of issues, Gibbons argues that the trial court should have granted these motions because the Luby's entities' committed various discovery abuses concerning the identity of the server to whom Gibbons and Floyd spoke about the croquettes. She asserts that Luby's violated a number of procedural rules,[73] and she lists some actions she claims the trial court should have taken in light of those alleged violations. As far as we can tell, other than citations to those rules, she does not cite a single case or any other authority to explain how the actions she complains of violated discovery rules, what the proper remedy is for those violations, why the failure to comply with

---

[72] *See Dallas Area Rapid Transit*, 2014 WL 6686331, at *6 (setting out the standard for reviewing a ruling on a motion for JNOV).

[73] *See* Tex. R. Civ. P. 193.3(c) (relating to withholding privileged communications), 215.1 (providing that a party may apply for sanctions or an order compelling discovery in accordance with the rule), 215.2(b)(3), (4) (discussing sanctions by a court in which an action is pending).

pretrial discovery rules entitled her to a JNOV, mistrial, or new trial, or why the trial court's failure to grant her motions was reversible error.[74] We overrule these issues as inadequately briefed.[75]

### 3.8. Rulings on Gibbons's Evidentiary Objections

In issues seventy-one through seventy-three, Gibbons complains of evidentiary rulings by the trial court relating to Floyd's testimony and to an excerpt of Luby's Inc.'s shareholder statement.

*Optional completeness*

Her first argument under this group of issues relates to the fact that, after the Luby's entities' attorney read an excerpt of Floyd's deposition testimony and questioned her about it, Gibbons and Floyd's attorney was not allowed to immediately read the rest of that part of Floyd's deposition testimony. The testimony had to do with what Gibbons asked the server at the restaurant about the croquettes.

The attorney for the Luby's entities asked Floyd about her deposition:

> Q. So did she ask them whether there was whitefish in the salmon? Which is correct, your testimony in August 2010 or your testimony today?

Floyd's answer to this question was objected to by the Luby's entities as nonresponsive. The trial court sustained the objection, and Gibbons's attorney

---

[74] *See* Tex. R. App. P. 38.1(i).

[75] *See Fredonia State Bank*, 881 S.W.2d at 284–85.

asked to read Floyd's answer to the very next question from the deposition "for optional completeness."  The trial court responded, "You can do that on redirect."

Opposing counsel began again to ask Floyd about her answer from the deposition:

> Q. . . . Back in August of 2010, under oath you were asked: "Did she ask them whether there was whitefish in the salmon croquette?"
>
> Your answer then was: "I believe so, yes."
>
> Am I reading that correctly?
>
> A. Yes, you are.

Gibbons's attorney objected, "It is clear from the following question and answer that that is a mischaracterization of her testimony."  The trial court responded, "And you can fully redirect on that."

The opposing attorney then continued to question Floyd about the deposition, including the following exchange:

> Q. . . . I just want to know whether—which one it is.  Did she ask them, as you said here, whether there was whitefish in the salmon or did she not, as you just [testified] today?
>
> A. I believe it's what I said today.
>
> Q. To me?
>
> A. To [our attorney], my last—where I re-parsed it, that she did not specifically ask.
>
> Q. Okay.  So your statement under oath in 2010 where you said that she did ask was incorrect?
>
> A. Yes.

39

Gibbons complains that under evidence rule 106,[76] the trial court's ruling that she could not read the next part of the deposition when requested was an abuse of discretion.

At the time of the trial, rule 106 provided (and still provides, in slightly different wording) that when one party has introduced part of a deposition, the adverse party may introduce *at that time* any other part of the deposition that in fairness should be considered contemporaneously.[77]  "The rule is based on two considerations: (1) the danger that material may be made misleading by being taken out of context, and (2) the inadequacy of a delayed repair."[78]

On redirect, Gibbons and Floyd's attorney asked Floyd about the next part of her deposition testimony, as he had wanted to during the Luby's entities' questioning.  He asked,

> Q. . . . [T]he question [opposing counsel] asked you now was: "Did she ask them whether there was whitefish in the salmon croquettes?"  And your answer was what?
>
> A. "I believe so, yes."

---

[76]Tex. R. Evid. 106, 61 Tex. B.J. 374 (1998, amended 2015).

[77] *Id.*; *see Jones v. Colley*, 820 S.W.2d 863, 866 n.2 (Tex. App.—Texarkana 1991, writ denied) (setting out the prior version of the rule).

[78] *Jones*, 820 S.W.2d at 866; *see also Lynch v. Noram Energy Corp.*, No. 06-99-00073-CV, 2000 WL 708419, at *10–11 (Tex. App.—Texarkana May 30, 2000, pet. denied) (mem. op., not designated for publication) (discussing the policy behind rule 106 and noting that although courts sometimes refer to rule 106 when discussing the rule of optional completeness, that rule, which is codified in rule 107, is broader than rule 106).

Q. And then the next question was: "What did she say?" And your answer was what?

A. "I'm allergic to whitefish. Is this just salmon? Is there anything else in here besides salmon? And they said, No, it's just salmon."

Although Gibbons and Floyd's attorney was not allowed to read this part of the deposition as soon as the first section of the deposition had been read, he was allowed to ask as soon as the Luby's entities finished asking Floyd about her depo answers. This questioning by the attorney for the Luby's entities came near the end of Floyd's trial testimony, and the redirect by her own attorney came very close in time to the questioning by the Luby's entities. Floyd's testimony covered approximately seventy-nine pages of the reporter's record. On twenty-three of those pages, she talked or was asked about what exactly she and Gibbons had said to and heard from the server regarding the croquette's ingredients and Gibbons's allergy.[79]

As we noted above, over the course of those twenty-three pages, Floyd had given slightly different versions of what was said to the servers that day. Floyd testified at trial that they had asked if there was whitefish in the salmon. But then when asked specifically whether Gibbons had asked, "Is there whitefish in the salmon?" or had instead asked, "Is there anything else in the salmon?"

_____

[79] *See* Tex. R. Evid. 611 (stating that "[t]he court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment").

41

Floyd responded, "I believe both, but it's kind of out of context." And she explained that she did not believe Gibbons had specifically asked the question, "is there whitefish in the salmon," but instead had said that she was allergic to whitefish, followed up by asking what the croquettes were, asked if there was anything other than salmon in the croquettes, and then saying "I can have salmon."

The Luby's entities relied on her testimony to show that while she had previously asserted that they had asked the server a specific question of whether the croquettes contained whitefish, she had changed her testimony at trial. The rest of the excerpt that Gibbons wanted to read at that time explained that what she meant was that she had raised the allergy and then asked if the croquettes were "just salmon." The jury had already heard Floyd say that Gibbons had asked specifically about whitefish in the croquettes, then change her testimony and clarify that, essentially, what she meant was that Gibbons had impliedly asked this question by asking if there was anything but salmon in the croquettes after having stated that she was allergic to whitefish. We hold that Gibbons has not shown harm from not being allowed to immediately read the excerpt in question, and as, such, any error is not grounds for reversal.[80] We overrule issues seventy-one through seventy-three.

---

[80]*See* Tex. R. App. P. 44.1; Tex. R. Evid. 611.

*Annual shareholder report*

In issues seventy-four through seventy-six, Gibbons argues that the trial court abused its discretion by sustaining the Luby's entities objections to the admission of Luby's Inc.'s annual shareholder report. In her brief, Gibbons complains of the exclusion of two exhibits: exhibit 31 and exhibit 44. Gibbons has not shown that she preserved her complaints about the failure to admit these exhibits.

Regarding exhibit 31, when Gibbons sought to admit the entire report, the Luby's entities objected that it was hearsay, irrelevant, and would improperly throw Luby's Inc.'s finances and revenues into the case. But the Luby's entities had no objection to a specific paragraph in the report that Gibbons's attorney wanted to have admitted. From the record, however, we cannot tell to which paragraph of the report Gibbons's attorney referred, and in any case, her attorney did not at that time have the paragraph admitted.

Instead, Gibbons's attorney argued that there were other statements in the report that he wished to have admitted. The trial court responded that the entire report could not be admitted because "[t]his is a huge report" and the court could not admit it *until it had been redacted*.

The two sides' attorneys then agreed to the admissibility of a portion of the report, but, again, it is not clear from the record which additional excerpts were agreed to, and those paragraphs were not, at that point, introduced for admission. Gibbons's attorney stated that he would have to make a copy of the relevant

43

parts of the report during lunch, "and then I can determine if there's other excerpts of this that I need. . . . So we'll come back to that." Gibbons does not tell us what part of the record shows that her attorney came back and asked to have those particular paragraphs admitted during her case and obtained a ruling.

Gibbons does, however, complain about the trial court's refusal to admit exhibit 44. Exhibit 44 consists of excerpts of the shareholder report. We cannot determine from the record, however, whether these are the same sections that were discussed when exhibit 31 was offered and to which the Luby's entities had no objections. The trial court admitted exhibit 44 for purposes of the record after Gibbons's case in chief. But Gibbons does not tell us where in the record the trial court previously ruled that exhibit 44 was not admissible.[81] All we have before us is a record that shows that Gibbons sought admission of part of the report, that some parts of the report were not objected to by the Luby's entities, and that Gibbons did not provide redacted excerpts with those parts and ask that they be admitted during her case in chief. We cannot tell from this record to what parts of the report Gibbons preserved her objections.

Further, even if the complaint had been preserved, the excerpts in exhibit 44 show statements related to improving restaurant profitability and managing expenses. Gibbons argues that the report "reveals the profit motive" that led Luby's Inc. "to require its subsidiary restaurants . . . to secretly chop up and mix"

---

[81]*See* Tex. R. App. P. 38.1(i).

44

leftover scraps of various types of fish into the croquettes "and deceptively market same to the public as 'salmon croquettes.'" This statement shows that Luby's Inc. wanted to improve its profits, as many businesses do, but nothing in the statement suggests that Luby's Inc. required its subsidiaries to *secretly* use fish scraps in its croquettes and then deceive the public into believing that the croquettes contained no type of fish but salmon. We overrule these issues.

3.9. Ruling on Motion to Determine When Appellees Anticipated Litigation

In Gibbons's seventy-seventh issue, she argues that the trial court abused its discretion by denying her request for a determination of when the Luby's entities reasonably anticipated litigation. She argues that the Luby's entities "improperly claimed that they anticipated litigation on or about October 29, 2007, i.e., three days after the occurrence giving rise to this lawsuit." She contends that this was done "in an apparent effort to thwart discovery of the investigation they did and statements they must have taken from the food servers who were actually working and served [Gibbons and Floyd]."

Gibbons wholly fails, however, to explain why, under the law or rules of procedure, it matters when the Luby's entities claimed to have anticipated litigation. She cites to no authority relating to when a party may claim to have anticipated litigation or what effect such a claim has. Accordingly, we hold that she waived this issue by inadequately briefing it.[82]

---

[82] *See id.*; *Fredonia State Bank*, 881 S.W.2d at 284–85; *see also* Tex. R. App. P. 44.1.

### 3.10.  Rulings on Juror Testimony

Issues seventy-eight through ninety-six all relate to Gibbons's assertions of juror misconduct and Gibbons's attempts to obtain juror testimony in support of her motion for new trial.  All of her arguments under these issues are included in the same section of her brief, although for some of her arguments, it is not readily apparent to which issue an argument relates.  In this section we also address issues 104 and 105, pertaining to alleged due process violations related to juror testimony.

Issues ninety-one through ninety-six address whether an outside influence affected the jury verdict.  The "outside influence" alleged by Gibbons is "in the form of a perceived obligation to reach a verdict," even though a juror considers the verdict unjust.  Gibbons contends that jurors John Bell and James Parks were both affected by this influence, causing each to agree to a verdict "with which he disagreed and which he considered unjust!"

In support, Gibbons directs our attention to Bell's testimony at the hearing on her motion for new trial.  The trial court sustained the Luby's entities' objection to the testimony but allowed Bell to testify for the record.[83]  Bell testified as follows:

> A. . . .  [W]e all kind of thought it was our job to come to an agreement[.]  . . . [W]e were actually divided down the middle of the table, so half of us didn't agree with lawsuits at all, and the other half of us agreed with lawsuits if . . . they were just . . . .  [I]n order for us

---

[83]*See* Tex. R. Evid. 103, 61 Tex. B.J. 374 (1998, amended 2015).

to come to an agreement, we all started negotiating, and this is the result[] of that negotiation.

Q. Okay. Did you feel an obligation to reach a verdict even if it was a verdict that you did not consider to be just?

A. Yes.

. . . .

. . . "[H]ung jury" never came to mind, and . . . all of us didn't know what a hung jury was and how long that would take and what all it would entail, and so we just—we wanted to come to a verdict, and that became kind of the—the point or the focus.

Gibbons argues that Bell's affidavit, which Gibbons attached to her motion for new trial, is also evidence of the same outside influence. Bell stated in his affidavit that during deliberations, jurors Tris Fitzgibbon, Brenda Webster, and Bobby Mayo said that they did not believe in awarding damages for mental anguish; that Mayo said that she did not believe in awarding damages for pain and suffering and that she did not believe in bringing lawsuits; that either Fitzgibbon or Webster said that awarding any damages for pain, mental anguish, or physical impairment went "against what [she] believe[d] in"; and that Webster and Mayo agreed with statements by Fitzgibbon that a dollar value could not be put on pain.

Bell averred that he regretted agreeing to what he believed was an unjust verdict and that he "agreed to the verdict primarily out of a desire to reach a consensus with jurors who stated that they did not believe in awarding damages for mental anguish, pain or physical impairment, so that [the jurors'] time on the

47

jury would not be wasted." Parks's affidavit made the same assertions, except that he further alleged that juror Carrie Whitman also said that she did not believe in awarding damages for mental anguish.

Gibbons cites no authority for the proposition that a perceived obligation to reach a verdict constitutes an outside influence on a juror,[84] and the law is against her. Evidence rule 606(b) allows a juror to testify about outside influences.[85] The Supreme Court of Texas has held that "[t]he rules contemplate that an 'outside influence' originates from sources other than the jurors themselves."[86] The court has further held that civil procedure rule 327(b) "operates to prohibit jurors from testifying about matters and statements occurring during deliberations," and thus, evidence of jury misconduct, including evidence of juror bias and a failure of a juror to disclose that bias, must come from some source other than testimony by jurors about their deliberations.[87]

---

[84]*See* Tex. R. App. P. 38.1(i).

[85]*See* Tex. R. Evid. 606(b); *see also Golden Eagle*, 24 S.W.3d at 370.

[86] *See Golden Eagle*, 24 S.W.3d at 370; *see also Wooten v. S. Pac. Transp. Co.*, 928 S.W.2d 76, 79 (Tex. App.—Houston [14th Dist.] 1995, no writ) (noting "it is well-established that, to constitute outside influence, information must come from outside the jury, [that is], *from a non-juror* who introduces information to affect the verdict, and not from within the jury's deliberations or as part of the jury's mental process" (emphasis added)).

[87]*See Golden Eagle*, 24 S.W.3d at 370.

Jurors in civil trials are flatly prohibited from testifying about their deliberations.[88] The testimony of Bell and Parks that Gibbons asked the trial court to consider related to jurors' statements made during deliberations and to beliefs held by jurors during deliberations. Accordingly, the trial court was correct not to consider the testimony.[89] We overrule issues ninety-one through ninety-six.

Gibbons argues in this section of her brief that the trial court abused its discretion by ruling that the depositions of Fitzgibbon, Whitman, and Mayo were stayed by the Luby's entities' filing of a motion to quash those depositions, because the motion did not object to the time or place of the depositions under civil procedure rule 199.4.[90] Based on her seventy-eighth through eight-fourth issues, Gibbons wanted to depose the jurors to gather evidence of the jurors' biases.

The motion to quash cited rule 199.4 and asserted that the motion had been filed within three days of service of the deposition notices in accordance with that rule. Gibbons makes no argument for why the invocation of rule 199.4 was not sufficient to raise an objection under that section or for how she was

---

[88] *Id.*

[89] *See id.* *But see McQuarrie v. State*, 380 S.W.3d 145, 154 (Tex. Crim. App. 2012) (deciding that under rule 606(b), a court may hear testimony that a juror conducted private internet research on an issue in the trial and discussed that research during deliberations, as evidence of an outside influence).

[90] *See* Tex. R. Civ. P. 199.4.

harmed by the quashing of the depositions given that, as explained below, the trial court could not have considered evidence of how those biases affected the verdict in this case.[91] We overrule her issues under this section of her brief to the extent that they are based on this argument.

Gibbons further argues that the trial court "unlawfully prohibited [her] from contacting any jurors," a prohibition that was later modified to apply only to Mayo and Whitman, who had filed objections to the depositions. Other than her argument about rule 199.4 and an unavailing argument based on *Castillo* (discussed below), she does not explain why the trial court's order was unlawful.[92] We overrule her issues to the extent they are based on this argument.

Gibbons argues in issues 104 and 105 that, given the testimony of Bell and Parks, her due process rights were violated by the trial court's judgment. Gibbons does not, however, explain how her due process rights were violated, nor does she cite any authority to support her position.[93] The evidence she cites relates to Bell's and Parks's testimony about jury deliberations, which under rule 327(b), the trial court could not consider. The Supreme Court of Texas has

---

[91]Tex. R. App. P. 38.1(i).

[92]*See id.*

[93]*See id.*

50

specifically held that rule 327(b) does not fail to afford litigants due process.[94]

We overrule issues 104 and 105.

Gibbons relies on *Ford Motor Co. v. Castillo*[95] to support her argument that she was entitled to take juror depositions. In *Castillo*, the parties reached a settlement while the jury was deliberating after the presiding juror sent out a note asking, "What is the maximum amount that can be awarded?"[96] Defendant Ford later sought to avoid enforcement of the settlement agreement by Castillo because it believed that an outside influence may have swayed the presiding juror and led to the sending of the note.[97] Ford sought to conduct discovery to "'determine the motivation of the presiding juror's actions and any outside influences that possibly swayed her.'"[98] The Supreme Court of Texas held that the trial court abused its discretion by entirely depriving Ford of discovery.[99]

*Castillo* does not help Gibbons because that case did not involve a motion for new trial after a jury verdict or the validity of a jury verdict; the issue of obtaining juror testimony in that case arose in the context of a defendant seeking

---

[94] *See Golden Eagle*, 24 S.W.3d at 375.

[95] 279 S.W.3d 656, 666–67 (Tex. 2009).

[96] *Id.* at 659.

[97] *Id.*

[98] *Id.* at 660.

[99] *Id.* at 666.

discovery to defend against a pending claim for breach of a settlement agreement.[100]   The Supreme Court of Texas specifically held that under the circumstances, rule 327(b) did not strictly apply.[101]   In the context of this case, however, that rule does strictly apply and prohibits the testimony of the jurors about the jury's deliberation, including what was said during deliberations or how any beliefs the jurors held influenced their votes.[102]

Regarding jurors Mayo, Fitzgibbon, and Whitman, Gibbons argues under issues eighty-five through eighty-nine that they failed to disclose during voir dire a bias against awarding damages for mental anguish and against negligence cases.  She argues under issue ninety that the trial court abused its discretion by denying her the opportunity "to obtain and/or present evidence that one or more jurors failed to disclose material information they were asked during jury selection."

For Fitzgibbon and Whitman, to support her argument that they failed to disclose biases, she relies on allegations in Bell's and Parks's affidavits that Fitzgibbon and Whitman disclosed these biases during deliberations.  The trial court could not consider such testimony.[103]   Nor could the court consider such

---

[100]*Id.* at 659.

[101]*Id.* at 666.

[102]*See* Tex. R. Civ. P. 327; *Golden Eagle*, 24 S.W.3d at 370.

[103]*See Golden Eagle*, 24 S.W.3d at 370–71.

testimony for the purpose of determining whether any such biases influenced their vote.[104]  Further, Whitman arguably disclosed her beliefs during voir dire when she admitted that she thought that in life "bad things happen," that money damages do not rectify "that something bad happened," that there was a limit to what she could award, and that in some cases, it bothers her somewhat when her employer, a railway company, is sued in personal injury cases.

As for Mayo, Gibbons further asserts that after trial, Mayo disclosed her bias to Gibbons's attorney during a telephone call.  She relies on her attorney's affidavit as evidence that Mayo made such statements.

Gibbons's attorney asked questions during voir dire about whether the panel members understood that the law does not require that a person have an intent to injure for the person to be liable in negligence and whether anyone would not be able to award damages for mental anguish, pain and suffering, or physical impairment.  Mayo made no affirmative representations during voir dire, other than a statement that she might in the future file a personal injury lawsuit against Johnson & Johnson.[105]  Some of the panel members were asked directly

---

[104]*See Golden Eagle*, 24 S.W.3d at 371; *see also Fitz v. San Antonio Hospitality Invs., Inc.*, No. 04-03-00251-CV, 2004 WL 840609, at *3 (Tex. App.—San Antonio Apr. 21, 2004, no pet.) (mem. op.) (stating that a court could only speculate as to whether a juror was influenced by her own bias when it came to calculating damages because learning of such influence would involve delving into the juror's thought processes during deliberations).

[105]*See In re Zimmer, Inc.*, 451 S.W.3d 893, 903 (Tex. App.—Dallas 2014, no pet.) (stating that "[a]n erroneous answer by a juror during voir dire warrants a new trial only if there is concealment by the juror" and that "[b]efore concealment

if they could award money damages for mental anguish and pain and suffering; Mayo was not one of those panel members.

A trial court may grant a new trial when provided with evidence that a juror gave an incorrect answer in voir dire if the incorrect answer is material and "if it reasonably appears from the evidence both on the hearing of the motion *and* the trial of the case and from the record as a whole that injury probably resulted to the complaining party."[106]   Thus, for the trial court to have abused its discretion by failing to grant a new trial, the evidence would have to show that Gibbons was probably injured by Mayo's failing to speak up in voir dire.

Assuming that the questions asked by Gibbons's attorney were specific and direct and called for a disclosure about whether Mayo had a personal bias against negligence claims and awarding non-economic damages,[107] Mayo's failure to speak up would not entitle Gibbons to a new trial.  Mayo did not sign the verdict; she was one of two jurors who did not agree to it.  To the extent that Bell and Parks compromised and agreed to a lower damages award to reach a verdict, it was not a compromise with Mayo.  There is no evidence that the trial

---

can be found, the questions asked [during voir dire] must be direct and specific and call for disclosure").

[106] *See* Tex. R. Civ. 327(a) (emphasis added).

[107] *See Zimmer*, 451 S.W.3d at 903.

court could consider that the opinion of the other jurors was colored by Mayo's beliefs (or, for that matter, the beliefs of Whitman and Fitzgibbons).[108]

Juries often reach a verdict through compromise, and doing so is not necessarily misconduct.[109] The extent to which any prejudices may have affected the jury's verdict is a matter about which the trial court could only speculate.[110] We cannot say that the trial court abused its discretion by determining that from the record as a whole, it did not reasonably appear that injury probably resulted to Gibbons by a juror's failure to speak up at voir dire. We overrule Gibbons's issues eighty-five through ninety.

Gibbons argues in issue eighty-four that she should be granted a new trial because juror Fitzgibbon did not appear to testify at the hearing on Gibbons's motion for new trial, but she does not cite any authority for why Fitzgibbon's failure to appear required the granting of a new trial, nor does she expound upon her assertion.[111] We overrule her eighty-fourth issue.

---

[108] *See Golden Eagle*, 24 S.W.3d at 371; *see also Fitz*, 2004 WL 840609, at *3.

[109] *See Pedernales Elec. Co-op., Inc. v. Pub. Util. Comm'n of Tex.*, 809 S.W.2d 332, 341–42 (Tex. App.—Austin 1991, no writ); *see also Owens v. Missouri Pac. Ry. Co.*, 4 S.W. 593, 595 (Tex. 1887) ("We presume that but few verdicts are returned giving damages for a tort in which the amount is not the result of a compromise between the members of the jury.").

[110] *See Golden Eagle*, 24 S.W.3d at 371; *Fitz*, 2004 WL 840609, at *3.

[111] *See* Tex. R. App. P. 38.1(i).

Under the group of issues challenging the trial court's orders related to juror testimony, Gibbons makes various other assertions without any argument or cited authority to support them. To the extent these assertions are made as part of an argument under these issues, the remainder of these issues are overruled as inadequately briefed.[112]

### 3.11.  Polling the Jury

Gibbons's issues 97 through 102 complain of the trial court's failure to allow her attorney the opportunity to request a poll of the jury.[113]

The right to poll the jury may be forfeited.[114]  Here, the trial court read the jury's verdict, accepted it, and thanked the jurors for their service.  The court then told the jurors that they were free to talk or to refuse to talk to anybody about the case or to provide affidavits to the attorneys about "things such as juror misconduct."  The trial court wrapped up its words to the jurors by asking the jurors to go to the jury room and telling them, "I'll come in and I have a few last words to say to you, and then you'll be excused.  So if you'll go to the jury room,

---

[112] *See id.*; *Fredonia State Bank*, 881 S.W.2d at 284–85.

[113] *See* Tex. R. Civ. P. 294 (providing that a party has the right to poll the jury).

[114] *Liberty Mut. Ins. Co. v. Transit Mix Concrete & Materials Co.*, No. 06-12-00117-CV, 2013 WL 3329026, at *3 (Tex. App.—Texarkana June 28, 2013, pet. denied) (mem. op.); *Suggs v. Fitch*, 64 S.W.3d 658, 660 (Tex. App.—Texarkana 2001, no pet.).

I'll be in right after you. Thank you." The record of the trial proceedings ends there.

At the hearing on Gibbons's motion for new trial, Gibbons's attorney stated that he had not been given a chance to poll the jury. Opposing counsel countered that Gibbons's attorney had not asked for a poll until it was too late. The trial court stated,

> Just for the record, you did not ask for the Court to poll the jury while I was in the courtroom, and I even speak to the jury after I read the verdict, and I give them their instructions required by law, and you never stood and asked me. And just for the record, I always allow polling of the jury when it's requested, and it was never requested.

Gibbons's attorney responded that he had, in fact, requested a poll while the jury was still present. The Luby's entities' attorney countered that the jury had already been dismissed when Gibbons's attorney requested a poll. The trial court responded, "The record will reflect what it reflects."

The record does not show an objection or request by Gibbons's attorney, and we may not take his word for it that the trial court was mistaken about whether he had made a request, that any request was timely, or that he objected to not being allowed to poll the jury.[115] We overrule Gibbons's issues related to polling the jury.

### 3.12. Further Rulings on Objections to Testimony

---

[115] *See* Tex. R. App. P. 33.1(a).

Gibbons's 103rd issue asserts that the trial court abused its discretion by sustaining the Luby's entities' objection to Bell's testimony at the hearing on Gibbons's motion for new trial. Her issue is based on the same arguments she raised under issues 104 and 105. Bell's testimony related to statements made by jurors during deliberations and to Bell's state of mind during deliberations. For the same reasons we overruled issues 104 and 105, we overrule this issue as well.[116]

In Gibbons's 106th issue, she complains of the trial court's overruling of her objections to Darlene Cole's and Nicole Huffman's testimony by deposition. Like Huffman, Cole was an employee of the restaurant and present on the day of the incident. Gibbons asserts that their addresses and telephone numbers were not provided to her in discovery and that Cole was not listed as a person with knowledge of relevant facts until around two weeks prior to trial, and so the trial court abused its discretion by allowing them to testify over her objection.

In their responses to Gibbons's and Floyd's requests for disclosure, the Luby's entities identified "Nicole Huttman" and "Darlene Cook" as Restaurants employees with knowledge of relevant facts. The response listed each employee's position at the restaurant and gave as their phone numbers and addresses the phone number and address of the attorney for the Luby's entities. Less than thirty days before trial, the Luby's entities supplemented their

---

[116] *See Golden Eagle*, 24 S.W.3d at 371.

responses to provide correct last names; the same attorney's address and phone number was still listed as Cole's and Huffman's address and phone number.

Civil procedure rule 193.6 provides that a party may not offer the testimony of a witness who was not timely identified unless the court finds that "there was good cause for the failure to timely make, amend, or supplement the discovery response" *or* that "the failure to timely make, amend, or supplement the discovery response will not unfairly surprise or unfairly prejudice the other parties."[117] Under rule 193.5, an amended or supplemental response must be made reasonably promptly, and it is presumed that the response was not made reasonably promptly if it was made less than thirty days before trial.[118]

Gibbons argues that the correct address for Cole and Huffman was never disclosed, but she makes no argument for why the law firm's address would not suffice for purposes of the rule.[119] The cases she relies on are distinguishable. In *Morrow v. H.E.B., Inc.*, a witness's address was listed in an interrogatory

---

[117]Tex. R. Civ. P. 193.6(a).

[118]Tex. R. Civ. P. 193.5(a).

[119]*See* Tex. R. App. P. 38.1(i); *see also In re C.S.*, 977 S.W.2d 729, 732–33 (Tex. App.—Fort Worth 1998, pet. denied) (stating that the purpose of the rule requiring disclosure of a witness's identity or location in answers to interrogatories is to "allow the opposing party to easily locate, interview, and depose the proposed witness" and that, although a complete street address for the witness at issue was not disclosed, under the facts of the case, the trial court could reasonably have concluded that the witness could have been easily located with the information provided, and therefore the witness had been sufficiently identified).

response as simply "Missouri," and when the party making the disclosure discovered that the witness had moved to an address in San Antonio, the party did not supplement or amend its disclosure.[120] In *Braniff, Inc. v. Lentz*,[121] *no* address or telephone number was listed for the witness at issue. *Clark v. Trailways, Inc.* also involved the total failure to provide an address.[122]

Further, even assuming that the misspelling of the last names and the attorney's address and phone number did not satisfy disclosure requirements, the cases cited by Gibbons all applied the former version of the rule amended in 1999 and now found at 193.6, under which failure to supplement or amend could be excused only for good cause.[123] Under the current version of the rule, failure to supplement or amend is also excused if the failure will not unfairly surprise or unfairly prejudice the other party.[124]

Gibbons cites a case for the proposition that "[t]he absence of surprise, unfairness, or ambush does not alone satisfy *the good cause exception* to the

---

[120]714 S.W.2d 297, 297 (Tex. 1986) (on reh'g).

[121]748 S.W.2d 297, 299 (Tex. App.—Fort Worth 1988, writ denied).

[122]774 S.W.2d 644, 646 (Tex. 1989).

[123]*See id.* (discussing former rule 215.5, now at 193.6 as amended); *Wal-Mart Stores, Inc. v. Tinsley*, 998 S.W.2d 664, 671 (Tex. App.—Texarkana 1999, pet. denied) (noting that former rule 215.5 is now rule 193.6).

[124]Tex. R. Civ. P. 193.6(a).

sanction of automatic exclusion."[125] That case also applied the former version of the rule requiring good cause for the failure to supplement or amend. Thus, the witnesses did not need to be excluded if Gibbons was not unfairly surprised or unfairly prejudiced.

Both witnesses were deposed, and Gibbons's attorney attended the depositions. And Gibbons introduced excerpts of Huffman's deposition in her case in chief. We decline to say that the trial court abused its discretion by determining that the Luby's entities had shown that Gibbons was not unfairly surprised by the Luby's entities failure to supplement their disclosures to correct Huffman's and Cole's names or provide their personal addresses more than thirty days before trial.[126] We overrule Gibbons's 106th issue.

### 4. Conclusion

Having overruled each of Gibbons and Floyd's issues, we affirm the trial court's judgment.

/s/ Lee Ann Dauphinot
LEE ANN DAUPHINOT
JUSTICE

PANEL: LIVINGSTON, C.J.; and DAUPHINOT, J.[127]

---

[125] *Sharp v. Broadway Nat'l Bank*, 784 S.W.2d 669, 671 (Tex. 1990) (emphasis added).

[126] *See In re C.S.*, 977 S.W.2d at 732–33.

[127] Justice McCoy was a member of the original panel but has retired in the interim.

DELIVERED:  August 31, 2015